**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SOUTHERN UNION COMPANY, *Plaintiff-Appellee,* v. JAMES M. IRVIN, *Defendant-Appellant.* | No. 06-17347<br><br>D.C. No.<br>CV-99-01294-ROS<br><br>ORDER AMENDING ORDER OF NOVEMBER 7, 2008, AND DENYING PETITION FOR REHEARING EN BANC AND AMENDED ORDER |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Submitted November 26, 2007*

Filed November 7, 2008
Amended March 27, 2009

Before: Stephen Reinhardt, John T. Noonan, and
Ferdinand F. Fernandez, Circuit Judges.

Order;
Concurrence by Judge Reinhardt;
Dissent by Judge Noonan

---

*The panel unanimously finds this case suitable for decision without oral argument. Fed. R. App. P. 34(a)(2).

3763

**COUNSEL**

Robert A. Mandel, Greenberg Traurig, LLP, Phoenix, Arizona, for the defendant-appellant.

Tom Q. Ferguson, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma, for the plaintiff-appellee.

---

**ORDER**

Upon further consideration,[1] we amend our order filed November 7, 2008, and commencing at slip op. 15281[2] as follows:

(1)  We add the footnote reference "4" following the word "remittitur" at slip op. 15285, seventh line (1233).

(2)  The footnote shall read as follows:

> [4]When a punitive damage award exceeds the constitutional maximum, we decide on a case-by-case basis whether to remand for a new trial or simply to order a remittitur. *Leatherman Tool Group v. Cooper Indus.*, 285 F.3d 1146, 1151 (9th Cir. 2002). Taking this case-specific approach, we have found different solutions to be appropriate in different circumstances. *Compare Planned Parenthood of Columbia/ Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 965 (9th Cir. 2005)("remand[ing] for the district court to order a new trial unless physi-

---

[1]Judges Reinhardt and Fernandez concur in this amendment. Judge Noonan dissented from the order of November 7, 2008, and does not join in this amendment.

[2]The order is published as *Southern Union Company v. Irvin*, 548 F.3d 1230 (9th Cir. 2008), and we will hereafter put page references to the published order in parentheses.

cians accept a remittitur"), *with In re Exxon Valdez*, 472 F.3d 600, 625 (9th Cir. 2006) (remitting the punitive damage award with no option for a new trial, so as to bring "protracted litigation to [an] end"), *reversed on other grounds by Exxon Shipping Co. v. Baker*, 128 S. Ct. 2606 (2008). Here, we conclude that it is appropriate to afford Southern Union the option of accepting the remittitur or re-litigating the case. We do so in light of the possibility that additional evidence might be submitted at a new trial that could affect the calculation of a proper punitive damage ratio, and moreover, in recognition that, while we are not required to do so in every case, "[t]o avoid any conflict with the Seventh Amendment, the preferable course is to afford the party awarded the grossly excessive punitive damages . . . the option of either accepting the remittitur of the punitive damage award or a new trial on that issue." *Morgan v. Woessner*, 997 F.2d 1244, 1258-59 (9th Cir. 1993).

The petition of Southern Union Co. for rehearing en banc was circulated to the judges of the court, and no judge requested a vote for en banc consideration. The petition for rehearing en banc is DENIED.

No subsequent petition for rehearing or for rehearing en banc may be filed in this matter.

---

## ORDER

The jury in this case awarded $975,181 in compensatory damages to Southern Union Company, of which it assessed forty percent or $395,072.38 against James M. Irvin, and went on to assess an additional $60,000,000 of punitive damages against him. On appeal, we vacated the punitive damage

award, which amounted to punitive damages of over 153 times the compensatory damage award. *See S. Union Co. v. Sw. Gas Corp.*, 415 F.3d 1001, 1009 (9th Cir. 2005) (*S. Union I*). We then remanded for a remittitur or a new trial on damages. *Id.* at 1011. The district court offered Southern Union the opportunity to accept a remittitur of punitive damages to $4 million, that is a punitive damage award at slightly over ten times the compensatory damage award. Southern Union accepted. Irvin again appeals.

Due Process "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519-20, 155 L. Ed. 2d 585 (2003). No "simple mathematical formula" exists in this area. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582, 116 S. Ct. 1589, 1602, 134 L. Ed. 2d 809 (1996).

Nevertheless, the Court has pointed to three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418, 123 S. Ct. at 1520. In considering them, our goal is to determine whether the punitive damages achieved their ultimate objectives of deterrence and punishment, without being unreasonable or disproportionate. *See Exxon Shipping Co. v. Baker*, ___ U.S. ___, ___, 128 S. Ct. 2605, 2621, 171 L. Ed. 2d 570 (2008); *State Farm*, 538 U.S. at 419, 426, 123 S. Ct. at 1521, 1524.

Here, the parties have not pointed to other similar cases, if, indeed, there are any, or to comparable penalties authorized for similar conduct. We therefore begin by looking to the other two guideposts.

We have already touched upon the second of them, and we do find the over ten to one ratio disquieting in this case, although choosing a correct ratio among the infinite number of ratios theoretically available is no easy task.[1] It is a guidepost we will return to after first considering the reprehensibility issue; that is the issue that the Court itself has referred to as the most important of the guideposts. *See BMW*, 517 U.S. at 575, 116 S. Ct. at 1599; *see also State Farm*, 538 U.S. at 419, 123 S. Ct. at 1521.

As we see it, most of the indicia of reprehensibility do not appear here. *See State Farm*, 538 U.S. at 419, 123 S. Ct. at 1521; *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 957-60 (9th Cir. 2005). Any harm caused was not to some poor struggling person; it was inflicted upon a very large company — one that Irvin claims to have thought was unsavory, by the way. Moreover, the harm was not physical; reckless disregard of the safety of others was not involved; Southern Union was not financially vulnerable; and the incident was isolated, although it was not a mere accident. When we say that the incident was isolated, we do not intend to condone Irvin's actions either at the time of the wrongdoing or at trial.[2] That is, we do not overlook the fact that Irvin held an important public position, which gave him great power to aid or wrong others.[3] Irvin, as the evidence showed, abused and misused his power and caused significant damage to Southern Union — he has been ordered to pay close to $400,000 of compensatory damages

---

[1]It is worth noting, however, that when the Supreme Court selected a ratio for federal maritime law purposes, rather than constitutional purposes, it saw a ratio of one to one as the "fair upper limit." *Exxon Shipping*, __ U.S. at __, 128 S. Ct. at 2633.

[2]At trial, Irvin actually sought to impede the jury's search for truth. *S. Union I*, 415 F.3d at 1008.

[3]The Commission of which he was a member "has sometimes been dubbed the fourth branch of the government of Arizona." *S. Union I*, 415 F.3d at 1014 (Fernandez, J., concurring and dissenting).

for that. But, the evidence does not *prove* that Irvin obtained (or sought) any personal gain from his actions, certainly no gain of a financial nature, whether or not that was the case.

So, as is always true, we return to the question of how much is enough, and of when the constitutional limit is reached. Irvin is far from commendable, but he has not inflicted egregious physical or economic harm upon the weak, and we cannot even say on the basis of the evidence that he sold his office for financial gain. He will also have to pay compensatory damages. That award of damages was not paltry or minimal by any means. It was substantial. Undoubtedly Irvin's behavior outraged the jurors and the district judge, all of whom listened to and saw him in the close quarters of a courtroom setting. Still, wrong and wrong-headed though he is, we do not see constitutional justification for calling down the wrath of Apollyon upon him and his finances.

In fine, as we see it, the Constitution permits a three to one ratio of punitive to compensatory damages in this case, but not more. That is the sum of $1,185,217.14 in addition to the compensatory damages of $395,072.38. In selecting this ratio, we have considered whether the amount of punitive damages it results in is commensurate with achieving the two purposes we have mentioned without exceeding the constitutional limit. We have determined that it is in this case. In so stating, we emphasize that where the constitutional limit lies with respect to punitive damages will vary from case to case. Determining that limit is an art, not a science; no mathematical formula controls; no single asymptote defines the limit for all cases.

We see no proper reason to remand this case to the district court for further proceedings regarding punitive damages. "Having already afforded the district court an opportunity to review the award[ ] in the first instance, we believe it is appropriate to remit rather than again to remand." *Planned Parenthood*, 422 F.3d at 963.

Therefore, we reverse the district court's judgment regarding the punitive damage award, and vacate it. We reduce the award to the amount of $1,185,217.14. We also remand so that the district court may order a new trial unless Southern Union accepts the remittitur.[4] If accepted, post judgment interest shall run on the reduced award from the date of entry of the original judgment, August 14, 2003. *See Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 518 F.3d 1013, 1022 (9th Cir. 2008).

REVERSED and VACATED as to the amount of the punitive damage award and REMANDED. The parties shall bear their own costs on appeal.

---

[4]When a punitive damage award exceeds the constitutional maximum, we decide on a case-by-case basis whether to remand for a new trial or simply to order a remittitur. *Leatherman Tool Group v. Cooper Indus.*, 285 F.3d 1146, 1151 (9th Cir. 2002). Taking this case-specific approach, we have found different solutions to be appropriate in different circumstances. *Compare Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 965 (9th Cir. 2005)("remand[ing] for the district court to order a new trial unless physicians accept a remittitur"), *with In re Exxon Valdez*, 472 F.3d 600, 625 (9th Cir. 2006) (remitting the punitive damage award with no option for a new trial, so as to bring "protracted litigation to [an] end"), *reversed on other grounds by Exxon Shipping Co. v. Baker*, 128 S. Ct. 2606 (2008). Here, we conclude that it is appropriate to afford Southern Union the option of accepting the remittitur or re-litigating the case. We do so in light of the possibility that additional evidence might be submitted at a new trial that could affect the calculation of a proper punitive damage ratio, and moreover, in recognition that, while we are not required to do so in every case, "[t]o avoid any conflict with the Seventh Amendment, the preferable course is to afford the party awarded the grossly excessive punitive damages . . . the option of either accepting the remittitur of the punitive damage award or a new trial on that issue." *Morgan v. Woessner*, 997 F.2d 1244, 1258-59 (9th Cir. 1993).

REINHARDT, Circuit Judge, concurring:

Although I concur in the order, I would add another consideration to our discussion of the relevant factors in assessing punitive damages.

If punitive damages are to achieve the twin purposes of deterrence and punishment, *see* Order at 15282-83, we must consider the impact of a damage award upon the particular defendant in determining the constitutional limit. The appropriate ratio of punitive to compensatory damages may vary with the amount of the compensatory damages and the net worth of the defendant. In some cases, although the conduct may be similar, because of lower compensatory damages or the defendant's higher net worth, a higher ratio may be necessary to achieve a deterrent or punitive effect. In other cases, where the variables are the opposite, a lower ratio may be appropriate.

For example, if $10,000 in compensatory damages is awarded against a defendant with a net worth of $50,000, then $10,000 in punitive damages may be an appropriate amount to achieve both the punitive and deterrent purposes. The same amount of punitives awarded against a company earning $1 billion a year, with a net worth of $50 billion, would hardly serve either of these objectives.

The precept that the defendant's wealth should be considered if we are to achieve the intended effects of deterrence and punishment is hardly novel. *See, e.g.*, *Browning-Ferris Indus. v. Kelco Disposal*, 492 U.S. 257, 300 (U.S. 1989) (O'Connor, J., concurring in part and dissenting in part) ("Blackstone remarked that the 'quantum, in particular, of pecuniary fines neither can, nor ought to be, ascertained by any invariable law. The value of money itself changes from a thousand causes; and at all events, what is ruin to one man's fortune, may be a matter of indifference to another's.' ") (quoting William Blackstone, 4 *Commentaries* *371); H.R.

Rep. No. 102-40, at 73 (1991) ("[J]uries normally take the defendant's financial standing into account in awarding punitive damages; courts have recognized that a higher amount may be appropriate against a particularly large or wealthy employer, to ensure effective deterrence."); Restatement (Second) of Torts § 908 (1979) ("In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.").

In the case before us, an award of over ten times the amount of the compensatory damages is far in excess of one that would reasonably accomplish the twin objectives. The proposed punitive damages are hardly commensurate with the need to deter the wrong-doer or others like him from committing similar offenses. Nor are they commensurate with the need to impose sufficient punishment on this defendant.

In sum, I write separately to express my agreement that the ratio arrived at today is not a magic figure, although it is the proper ratio here, but, more important, to make the point sometimes overlooked, that there should be no fixed ratio; rather, in a number of cases the ratio must be determined in light of the two purposes discussed above.

---

NOONAN, Circuit Judge, dissenting:

What's a court of appeals up to when it decides that it is better equipped to determine a defendant's delinquency and to assess the appropriate penalty than the judge who heard the testimony and who has even experienced the defendant's misconduct in her court? A federal court of appeals has a definite duty when it reviews an award of punitives. In a federal case, it must decide whether the damages are so excessive and so unexpected that they offend the principle of fairness enshrined

in the Due Process Clause of the Fifth Amendment. *See BMW of North America v. Gore*, 517 U.S. 559, 574 (1996). The legal question is to be decided de novo. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 435-436 (2001).

In reaching this determination of constitutional law the court is to be guided by the degree of reprehensibility of the offense; the ratio of the punitives to the compensatory damages awarded; and the civil or criminal penalties that could be awarded for comparable misconduct. *Gore*, 512 U.S. at 574-585. Unavoidably a reviewing court must exercise its own judgment in applying these guideposts to the facts established in the case. The court must exercise further judgment in determining whether its legal conclusion, after applying these legal guides, is that the constitution has been violated by the award. Undeniably, in the absence of a mechanical rule, the subjective views of the judges affect the decision. *See* Karlan, " 'Pricking the Lines': The Due Process Clause, Punitive Damages and Criminal Punishment." 88 *Minn. L. Rev.* 880, 883 (2004). But this judgment must be based on facts.

She who heard the case is in the best position to determine the facts. In the exercise of this function, she is analogous to a sentencing judge in a criminal case: she has heard all the witnesses and formed a judgment of the defendant's demeanor and credibility. *Cooper Industries*, 532 U.S. at 440. What the reviewing court is not free to do is to make up facts or suppress facts established at trial. The legal question before the court, do the damages awarded offend due process of law, is not to be confused with the question: would I have awarded these damages if I were the district judge. Our court, I suggest, has answered the latter, irrelevant query.

No need here to set out at length the facts established at trial and stated in our opinion upholding Irvin's liability. *Southern Union v. Irvin*, 415 F.3d 1001 (9th Cir. 2005). I summarize those facts and what could rationally be inferred

from them: Irvin, the chairman of the Arizona Corporation Commission, worked determinedly for a period of four months to promote the merger of an Arizona utility company with another utility and to defeat a merger proposed by Southern Union over $100 million more beneficial to the Arizona company. In court, Irvin testified that the motive of his machinations was the public good and that his calculated course to achieve his end was within the scope of his official duties. The jury did not believe his tale. To the contrary, the jury awarded punitives that reflected outrage at Irvin's outrageous conduct. As his motive was not the public welfare, what prompted his outrageous behavior? Ruling on the award of punitives, the district court found as a fact that one motive consisted in Irvin's "personal interests." *Southern Union Co. v. Southwest Gas Corp.*, 281 F.Supp.2d 1090, 1096 (2003).

Because Southern Union challenged its rival in court before the Irvin-backed transaction went through, no bribe was paid. But consider what a rational jury could have inferred from the fact that a young protégé of Irvin with little else to recommend him except this connection was to be paid a super-large fee for his help in arranging the deal. One does not need to look further to identify Irvin's "personal interests."

The district court also found:

Irvin's purposeful persistence in this effort was matched by his efforts at concealment. As far as possible, his activities to block the merger were kept from his fellow commissioners. *Southern Union Co.*, 281 F. Supp.3d at 1094. Afterwards he covered up his wrongdoing to ensure the outcome of the scheme. *Id.* When Southern Union challenged him and began litigation, his effort at concealment continued. He persevered in hiding his wrongful acts throughout the trial and in particular while testifying before the jury. Egregiously, he arranged the manufacture of evidence, purported notes of his wife's telephone conversation, which he persuaded his counsel to present as genuine to the court. *Id.* at 1096. Such intentional

fabrication of evidence confirmed his consciousness of guilt and added to the reprehensibility of his conduct.

It is not apparent to me how this court can overlook, neglect, or minimize these findings of the trial judge. It is equally not apparent to me how this court can treat the dereliction of duty by a high public official as though it were a run-of-the-mill tort. I take judicial notice of the existence and conclusion of a report to the Arizona legislature. Fed. R. Evid. 201(b); *Transmission Agency of Northern California v. Sierra Pacific Power Co.,* 295 F.3d 918, 924 (9th Cir. 2002). Irvin was a prominent Republican, holding high elective office in Arizona. The Republican-controlled Arizona House of Representatives conducted an investigation of his conduct as commissioner of corporations and recommended his impeachment for "high crimes and misdemeanor under the Arizona constitution." *In the Matter of the Arizona House of Representatives Investigation of Certain Allegations Against State Corporation Commissioner James M. Irvin, Vol. I: Southern Union v. Irvin*, AZ H.R. Rep., 46th Leg., 191 (2003). Irvin resigned a week after the report became known. Central to the report was Irvin's conduct affecting the Southern Union merger.

I do not cite the report as further evidence of the conduct already established in court, but as a measure of the reprehensibility of Irvin's conduct. Punitives cannot be used to punish a defendant for harming persons not before the court. *Philip Morris, USA v. Williams*, 127 S. Ct. 1057, 1063 (2007). At the same time, "Evidence of actual harm to nonparties can help show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Id*. As we have already determined, Irvin's "exploitation of high public office" and the noneconomic damage done by him in fabricating evidence in his defense in court were proper factors to be considered in the punitives award. *Southern Union v. Irvin*, 415 F.3d 1001, 1011 (2005). Due process has not been denied this man faithless in public office and unscrupulous in his own defense.

I dissent.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.