**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>WILLIE N. MOON and ADNETTE M.<br>GUNNELS-MOON,<br><br>               Debtors.<br><hr>RUSHMORE LOAN MANAGEMENT<br>SERVICES, LLC,<br><br>          Appellant/Cross-<br>          Appellee,<br>v.<br>WILLIE N. MOON; ADNETTE M.<br>GUNNELS-MOON,<br><br>          Appellees/Cross-<br>          Appellants. | BAP Nos. NV-20-1057-BGTa<br>          NV-20-1070-BGTa<br>          (Cross-Appeals)<br><br>Bk. No. 13-bk-12466-MKN<br><br><br><br>**MEMORANDUM**<sup>*</sup> |

Appeal from the United States Bankruptcy Court
for the District of Nevada
Mike K. Nakagawa, Bankruptcy Judge, Presiding

Before:    BRAND, GAN, and TAYLOR, Bankruptcy Judges.

---

       <sup>*</sup> This disposition is not appropriate for publication.  Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

# INTRODUCTION

Willie Moon and Adnette Gunnels-Moon filed a chapter 13[1] case to save their home ("Residence"). They avoided the second lien on the Residence held by Rushmore Loan Management Services, LLC ("Rushmore"), and the court confirmed their plan. After confirmation, the Moons received telephone calls and correspondence from Rushmore seeking to collect on the second mortgage. Willie informed Rushmore of their bankruptcy case, but the collection efforts continued. For Rushmore's willful violation of the automatic stay, the bankruptcy court awarded the Moons $100,742.10 in compensatory damages, which included $100,000 for Willie's emotional distress, and $200,000 in punitive damages. The bankruptcy court did not award damages for violation of the discharge injunction.[2] Rushmore appeals the bankruptcy court's ruling with respect to Willie's damages, the punitive damages award, and the court's decision to allow testimony from the Moons' expert witness. The Moons appeal the bankruptcy court's denial of damages for Rushmore's violation of the discharge injunction. We AFFIRM in part, REVERSE in part, and VACATE and REMAND in part.

We conclude that Rushmore did not violate Willie's automatic stay, and

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[2] The bankruptcy court has since awarded the Moons their attorney's fees, which is the subject of another appeal. *See* BAP Nos. NV-20-1144-BTF & NV-20-1155-BTF. This Memorandum is entered concurrently with the Memorandum in those related appeals.

so he was not entitled to any compensatory damages under § 362(k)(1). Rushmore did not seek to obtain possession of property of Willie's estate. The violations occurred post-confirmation. There was no violation as to the Residence. It was owned by Adnette, not Willie, and it had revested in Adnette when the violations occurred. Willie's interest in the Moons' community income also revested at confirmation, except to the extent necessary to fund plan payments. Furthermore, there was no violation of Willie's stay with respect to the efforts to collect Rushmore's debt. The debt was Adnette's alone. Therefore, we REVERSE the $100,000 award in compensatory damages to Willie.

While we AFFIRM the bankruptcy court's ruling that Adnette was entitled to punitive damages, we VACATE and REMAND the amount of that award for the court to review given that we are reversing the damages award to Willie. Further, we AFFIRM the court's denial of damages for violation of the discharge injunction. Finally, we AFFIRM the court's allowance of testimony from the Moons' expert witness.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Background of the parties

The Moons are in their seventies and have been married since 1998. Willie retired from truck driving in 2007; Adnette works as a library aide at an elementary school. Both Willie and Adnette have health issues. Willie is a Vietnam veteran and suffers from post traumatic stress disorder as a result of

his military service. In addition, Willie has chronic obstructive pulmonary disease, diabetes, high cholesterol, hypertension, and asthma. His conditions require him to take a number of prescribed and over-the-counter medications daily. Adnette has high cholesterol, hypertension, and asthma, for which she takes several prescribed medications.

In 2005, Adnette and her daughter purchased the Residence where Adnette and Willie live. Willie quitclaimed any community interest he had in the Residence to Adnette in 2005. In 2007, Adnette refinanced the Residence in her name only, taking out two loans. Rushmore began servicing the second loan in January 2012. No payments have been made on the Rushmore loan since November 2012.

## B.    Chapter 13 case

Unable to remain current on both mortgages, the Moons filed a chapter 13 bankruptcy case on March 26, 2013. They listed the Residence with a value of $120,000 subject to two liens: the first in favor of Chase for $154,000; the second in favor of Rushmore for $73,000.[3] The bankruptcy notice was sent by mail to creditors listed on the creditor matrix.

Thereafter, the Moons moved to value the Residence under § 506(a) to strip off Rushmore's entirely unsecured lien. Rushmore did not respond. After a hearing, the bankruptcy court entered an order granting the valuation

---

[3] Chase filed a secured proof of claim for $256,581.76. Rushmore did not file a proof of claim.

motion. Rushmore, as an unsecured creditor, would receive pro-rata payment along with other general unsecured creditors.

On April 7, 2014, the bankruptcy court entered an order confirming the Moons' amended chapter 13 plan ("Plan"). The 36-month Plan provided for monthly payments of $500.00. General unsecured creditors would receive pro-rata $9,542.83. The Plan noted that the Moons had successfully stripped off Rushmore's second lien. The chapter 13 trustee's notice of proposed distribution stated that Rushmore had not filed a proof of claim and, therefore, would receive $0.00 under the Plan.

In August 2016, the trustee filed a final report indicating that all Plan payments had been made. The bankruptcy court entered an order of discharge for the Moons on September 28, 2016, discharging their prepetition unsecured debt including the debt owed to Rushmore. A final decree closing the case was entered on October 3, 2016.

As it turns out, no documents filed during the Moons' chapter 13 case — the bankruptcy notice, any motions, applications, notices of hearings, court orders or other papers — were served on Rushmore due to an address error. The address error stemmed from a mistake made in the creditor matrix when the case was filed and continued throughout the case.

## C.    Contempt Motion

After reopening their bankruptcy case, the Moons filed a motion for contempt, seeking to hold Rushmore in contempt for violation of the

automatic stay under § 362(a) and the discharge injunction under § 524(a)(2) ("Contempt Motion"). The Moons alleged that, between November 2013 and October 2018, Rushmore sent a multitude of correspondence including monthly mortgage statements and other collection letters. All of Rushmore's correspondence was addressed only to Adnette. The Moons also alleged that, during the same five year period, Rushmore made "hundreds" of calls to the Residence telephone asking for payment. The Moons sought damages for their emotional distress, punitive damages, and attorney's fees. Because the address error had now been corrected by the Moons' new bankruptcy attorney, Rushmore was served with and received the Contempt Motion.

The bankruptcy court scheduled a two-day evidentiary hearing, and set deadlines for submission of declarations, exhibits, and additional briefs. Despite having several months to do so, Rushmore never filed a substantive response to the Contempt Motion. The Moons submitted their direct testimony declarations from Willie, Adnette, and expert witness, John Rao. Rushmore submitted a direct testimony declaration from its only witness, Anthony Younger, a Rushmore employee.

All four witnesses were subject to cross-examination of their direct testimony at the evidentiary hearing. After the witnesses' testimony and the parties' closing arguments, the court took the matter under submission.

**D. The bankruptcy court's ruling on the Contempt Motion**

The bankruptcy court entered an Order and Memorandum Decision

6

granting the Contempt Motion and awarding the Moons $100,742.10 in compensatory damages and $200,000 in punitive damages for Rushmore's willful violation of the automatic stay under § 362(k)(1). *In re Moon*, 613 B.R. 317, 361 (Bankr. D. Nev. 2020). The court declined to award the Moons damages for Rushmore's violation of the discharge injunction under § 524(a)(2) and § 105(a) because the Moons had not established when Rushmore became aware of the discharge order.

The court determined that Rushmore willfully violated the automatic stay with its collection efforts. *Id.* at 346-50.[4] The court found that Rushmore received notice of the Moons' bankruptcy on December 20, 2014, when Willie told the Rushmore representative in a phone call to the Residence that he and Adnette were "in a chapter 13," which was confirmed by the representative's notation in the loan file. The court found that Rushmore intentionally acted to collect the debt through its telephone calls to the Residence and its mailings of mortgage statements and other collection letters. During the 648-day period between December 20, 2014, and the discharge date of September 28, 2016, the court found that Rushmore made "hundreds" of telephone calls to the Residence and mailed at least 50 mortgage statements and other collection letters. Because Willie was the one who answered Rushmore's calls and

---

[4] The bankruptcy court apparently found that Rushmore violated § 362(a)(4), (5) and (6). *Id.* at 340. Although it cited to § 362(a)(3), in addition to (4) and (5), when discussing (3) the court quoted language from (6). *Id.* In any case, as we explain below, the court erred in determining that Rushmore violated any provision of § 362(a) as to Willie.

handled the Moons' daily mail, the court found that Willie suffered significant harm that was caused by Rushmore's automatic stay violations and awarded him $100,000 for his emotional distress. *Id.* at 356-57. The court declined to award Adnette emotional distress damages, because she testified that her distress was caused by Rushmore's discharge injunction violations, not stay violations. *Id.* at 356. The court also awarded punitive damages, finding Rushmore's policies and conduct "reprehensible." *Id.* at 359-61. These timely cross-appeals followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(1) and (2)(A). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Could Willie recover damages under § 362(k)(1)?

2. Did the bankruptcy court abuse its discretion in awarding $200,000 in punitive damages?

3. Did the bankruptcy court abuse its discretion by allowing Rao to testify as an expert witness?

4. Did the bankruptcy court abuse its discretion by not awarding the Moons discharge injunction violation damages?

## IV. STANDARDS OF REVIEW

Rushmore contends that Willie lacked standing to sue for damages under § 362(k)(1). Because Rushmore challenges the bankruptcy court's legal

8

determination about the scope of § 362(k)(1), a de novo standard of review applies. *See Chugach Timber Corp. v. N. Stevedoring & Handling Corp. (In re Chugach Forest Prods., Inc.)*, 23 F.3d 241, 244 (9th Cir. 1994). "De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014) (citations omitted).

We review the amount of sanctions imposed for a willful violation of the automatic stay for abuse of discretion. *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1213 (9th Cir. 2002). We review for clear error the bankruptcy court's factual findings in support of a punitive damages award. *See Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1347 (9th Cir. 1987), *opinion modified on reh'g*, 866 F.2d 318 (9th Cir. 1989). Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

We review a bankruptcy court's decision to admit expert testimony for abuse of discretion. *See Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010), *as amended* (Apr. 27, 2010).

A bankruptcy court abuses its discretion if it applies the wrong legal standard, or misapplies the correct legal standard, or makes factual findings that are illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

# V. DISCUSSION

Rushmore does not challenge the bankruptcy court's ruling that it willfully violated the automatic stay with its collection efforts or the award of compensatory damages of $742.10. It challenges only the award of emotional distress damages to Willie, the award of punitive damages, and the court's decision to allow Rao to testify as an expert witness. The Moons challenge the bankruptcy court's decision to not award damages for Rushmore's violation of the discharge injunction. We address each argument in turn.

## A. Willie cannot recover damages under § 362(k)(1).

Rushmore argues that the bankruptcy court erred by awarding Willie damages under § 362(k)(1).[5] Rushmore argues that its collection efforts could not have violated Willie's stay, since the debt was not his, the Residence was not his, and the Moons' community income was no longer property of either Willie's or Adnette's bankruptcy estates at the time Rushmore was said to have violated the automatic stay.

The bankruptcy court did not address this threshold issue, even though Rushmore raised it at the evidentiary hearing. We asked for further briefing on the matter at oral argument.

Section 302(a) provides that the filing of a joint bankruptcy petition by

---

[5] Section 362(k)(1) provides, in relevant part, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

spouses does not create one bankruptcy estate, made up of their combined assets and liabilities. Rather, it creates two separate estates, one for each spouse. *Ageton v. Cervenka (In re Ageton)*, 14 B.R. 833, 835 (9th Cir. BAP 1981). Each estate consists of its own property separately protected by the automatic stay. *See* 1 Henry J. Sommer & Margaret Dee McGarity, *Collier Family Law and the Bankruptcy Code* ¶ 1.03[5] (2020). Further, the joint administration of a case, as opposed to a consolidation, does not affect whatever claims creditors have against either spouse individually. *In re Fernandes*, 346 B.R. 521, 522 (Bankr. D. Nev. 2006). No consolidation occurred in this case. Hence, Willie's and Adnette's debts and estates remained separate — and so did the automatic stays protecting them and their respective estates.

Notwithstanding the general rule of separate estates, in a community property state such as Nevada each spouses' estate "consists of virtually all the community property of the joint debtor's spouse." *In re Ageton*, 14 B.R. at 835. Property of the estate includes "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is under the sole, equal, or joint control of the debtor[.]" § 541(a)(2)(A). The only potential community property of relevance is the Residence and the Moons' income.

Starting with the income, in Nevada, "wages of either spouse during marriage are considered to be community funds regardless of which spouse earns the greater income or which spouse supports the community." *Norwest*

*Fin. v. Lawver*, 849 P.2d 324, 326 (Nev. 1993) (citing *Robison v. Robison*, 691 P.2d 451, 453 (Nev. 1984)). As with all community property in Nevada, each spouses' interest is under the joint control of both spouses. *In re Field*, 440 B.R. 191, 195 (Bankr. D. Nev. 2009) (citing NEV. REV. STAT. §§ 123.225 & 123.230 and *Soper v. Crystal Palace Gambling Hall, Inc. (In re Crystal Palace Gambling Hall, Inc.)*, 36 B.R. 947, 950 (9th Cir. BAP 1984)). Thus, given that joint control and the joint filing, Willie's and Adnette's interests in the community income became property of each of their estates when they filed their petition. *See id;* § 541(a)(2)(A).

Whether the Residence became property of Willie's estate, however, is not as clear. Although Willie testified that he contributed to the Chase mortgage payments, it is undisputed that he quitclaimed his community interest in the Residence to Adnette in 2005. In Nevada, "a spouse to spouse conveyance of title to real property creates a presumption of gift that can only be overcome by clear and convincing evidence." *Kerley v. Kerley*, 910 P.2d 279, 280 (Nev. 1996) (citations omitted). Whether the fact Willie made some payments on the Chase mortgage would rebut the presumption of gift by a clear and convincing standard is unclear. This issue was not sufficiently litigated before the bankruptcy court. However, whether or not Willie had a community interest in the Residence as of the petition date is of no consequence in this unusual case.

Turning now to whether Rushmore violated Willie's automatic stay, the

only provisions of § 362(a) that could plausibly apply here are (3), (4), (5) and (6). To begin, § 362(a)(4) and (5) — any act to enforce a lien against property of the estate or property of the debtor — are inapplicable to **both** Willie and Adnette, because Rushmore did not take any actions to foreclose its lien; it only sought payment. We also can eliminate § 362(a)(6) as to Willie — any act to collect a prepetition claim against the debtor — because Rushmore never had a claim against Willie, only Adnette as the borrower.

That leaves § 362(a)(3) — whether Rushmore's repeated requests for payment were "act[s] to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[6] Assuming § 362(a)(3) even applies to a prepetition debt,[7]and Willie had a community interest in the Residence, which was not established on the record, we agree with Rushmore that the Residence revested in the Moons (or at least Adnette) upon confirmation of the Plan in April 2014 by virtue of

---

[6] While not relevant to our decision, Rushmore argues that only the trustee has standing to allege violations of the automatic stay relating to property of the estate under § 362(a)(3), citing *Zavala v. Wells Fargo Bank, N.A. (In re Zavala)*, 444 B.R. 181, 190-91 (Bankr. E.D. Cal. 2011). Rushmore's argument is misplaced. *Zavala* was a chapter 7 case, which is different from chapter 13.

[7] Although the statute is not expressly limited to postpetition debts or creditors, we could not locate, and the parties did not cite, a case where a court applied § 362(a)(3) to a prepetition creditor. Presumably, this is because a claim against a prepetition creditor seeking payment postpetition can generally be brought under § 362(a)(6). However, given the unusual facts of this case, that provision did not apply to Willie.

§ 1327(b) and the Plan.[8] As a result, the Residence was no longer "property of the estate" and protected by the automatic stay in December 2014, when Rushmore was deemed to have knowledge of the Moons' bankruptcy and to have violated the stay with its collection efforts thereafter until discharge.[9] § 362(c)(1).

Willie also cannot establish that Rushmore violated his stay under § 362(a)(3) with respect to the community income. It revested in the Moons at confirmation, except for the amount of funds necessary to fulfill the Plan. *Cal. Franchise Tax Bd. v. Kendall (In re Jones)*, 657 F.3d 921, 928 (9th Cir. 2011) (addressing the interplay between § 1306(a) and § 1327(b) and holding that, because debtor did not elect in her plan anything contrary to § 1327(b), she once again became the owner of her property at confirmation, "except as to those sums specifically dedicated to fulfillment of the plan"). The portion of the Moons' post-confirmation income necessary to make the plan payments remained property of the estate and protected by the automatic stay.[10] But the

---

[8] Section 1327(b) provides: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." The Plan, which is a form plan for the District of Nevada, states: "Any property of the estate scheduled under § 521 shall revest in the Debtor upon confirmation."

[9] This is also true with respect to § 362(a)(4).

[10] We note that the Panel in *California Franchise Tax Board v. Jones (In re Jones)*, 420 B.R. 506, 514-15 (9th Cir. BAP 2009), *aff'd on other grounds*, 657 F.3d 921 (9th Cir. 2011), adopted the "estate termination" approach, which dictates that upon confirmation all

(continued...)

14

balance of that post-confirmation income belonged to them and was not protected by the automatic stay. *Id.*; § 362(c)(1).[11]And the Moons did not establish that the loss of any potential mortgage payments to Rushmore would have jeopardized their ability to meet their obligations under the Plan. *See In re Heath*, 115 F.3d at 524.

Given that no provision of § 362(a) applied to Willie with respect to Rushmore, Willie could not sue Rushmore for damages under § 362(k)(1) and the bankruptcy court erred in concluding otherwise.[12]As a result, on the

_____

[10](...continued)
property revests in the debtor and estate property is terminated unless the plan provides otherwise. On appeal, the Circuit Panel declined to adopt the estate termination, or any other, approach, holding that, unless the debtor elects otherwise in the plan all property of the estate revests in the debtor upon confirmation, "except as to those sums specifically dedicated to fulfilment of the plan." *In re Jones*, 657 F.3d at 928.

Despite its reluctance to adopt any of the four approaches courts have taken with respect to estate property and the interplay between § 1306 and § 1327(b), the Circuit Panel's holding in *Jones* is essentially the "estate transformation" approach, which dictates that only property needed to fund the plan remains estate property upon confirmation; all other property revests in the debtor. *See Black v. U.S. Postal Serv. (In re Heath)*, 115 F.3d 521, 524 (7th Cir. 1997) (adopting the "estate transformation" approach). Therefore, while the Circuit Panel did not expressly overrule our decision in *Jones*, our holding with respect to the estate termination approach is in question. However, we need not decide that issue here, because Willie's claim fails under either approach.

[11] The Plan's language — "The future earnings of Debtor shall be submitted to the supervision and control of Trustee as is necessary for the execution of the plan" — does not help the Moons. Such language only gives the trustee a basis for monitoring and requiring execution of the provisions of the Plan. It does not negate the revesting of property at confirmation in accordance with § 1327(b). *In re Jones*, 420 B.R. at 516-17.

[12] Rushmore did, however, violate the automatic stay as to Adnette under

(continued...)

15

current record, the court's award of $100,000 to Willie for his emotional distress cannot stand.

**B. The bankruptcy court did not abuse its discretion in awarding punitive damages.**

Punitive damages may be awarded under § 362(k)(1) for a willful violation of the automatic stay in "appropriate circumstances." The Ninth Circuit requires a showing of reckless or callous disregard for the law or rights of others for an award of punitive damages under § 362(k)(1). *See Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 228 (9th Cir. 1989) (applying former § 362(h)). In awarding punitive damages, a court should consider: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases. *Ariz. v. ASARCO LLC*, 773 F.3d 1050, 1054 (9th Cir. 2014) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) ("*State Farm*") (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996))).

"Generally speaking, there are two underlying purposes for punitive damage awards: to punish outrageous conduct and to deter future similar conduct." *Orian  v. Asaf (In re Orian)*, No. CC-18-1092-SFL, 2018 WL6187784, at *13 (9th Cir. BAP Nov. 27, 2018) (citations omitted). In reviewing a punitive

---

[12](...continued)
§ 362(a)(6), which it does not dispute.

damages award, the goal is to determine "whether the punitive damages achieved their ultimate objectives of deterrence and punishment, without being unreasonable or disproportionate." *S. Union Co. v. Irvin*, 563 F.3d 788, 791 (9th Cir. 2009).

Before we address the amount of punitive damages the bankruptcy court awarded, we look first to the evidentiary record and the court's decision that punitive damages were warranted. Younger, Rushmore's Legal Proceeding Specialist, testified that Rushmore utilizes a bankruptcy policy manual and a bankruptcy procedures manual. The policy manual provides that notice of a borrower's bankruptcy can be of any nature, written or oral, and by telephone or in person, and states that Rushmore will act promptly in response to a notice of any nature that a borrower is in bankruptcy. Despite this seemingly broad notice policy, Rushmore's procedures manual provides that notice of a borrower's bankruptcy filing is only acknowledged if Rushmore receives it through one of five methods: (1) Foreclosure Specialist; (2) Foreclosure Attorney; (3) Borrower phone call; (4) Mail; and (5) ACCER — a bankruptcy filing notification service.

Younger testified that notice of a borrower's bankruptcy by a telephone call from an "unauthorized" party would not be recognized, because Rushmore considers an unauthorized party as an unreliable and unverifiable source. Younger testified, if an unauthorized party informs a Rushmore representative that a borrower is in bankruptcy, the representative makes a

17

notation in the file that the comment was received but does not conduct a PACER search. Rather, Rushmore attempts to contact the borrower to confirm the bankruptcy. That is what happened here. Willie, an unauthorized third party not recognized in Rushmore's procedures manual, provided the bankruptcy notice, so no PACER search was done. And, because Rushmore was unable to verify the bankruptcy with Adnette, it continued to service the loan as normal.

The bankruptcy court found, while Rushmore's policies acknowledged the fundamental importance of the automatic stay to its borrowers, putting it on fair notice of the consequences under § 362(k), Rushmore adopted express procedures to narrow the sources of bankruptcy information that it is willing to acknowledge, and does not even tell its borrowers what those sources are. *In re Moon*, 613 B.R. at 359-60. Specifically, the court found that Rushmore had an unwritten policy or procedure for deeming sources as "unauthorized" parties whose information will not deter or prevent it from violating the bankruptcy protections of its borrowers. *Id.* at 360. The court was particularly troubled by Rushmore's failure to follow up on the representative's notation in the loan file that the Moons were in bankruptcy, in spite of Rushmore's expressly stated policy that it "will act promptly in response to notice of any nature, whether written or oral (telephonic or in person), that a borrower has filed for bankruptcy protection." *Id.* at 346-47. The court found Rushmore's procedures especially egregious considering that the sources of notification

18

specified in its procedures manual were not limited to just the borrower; four of the five sources were non-borrower sources. Thus, for Rushmore to suggest that a borrower's spouse would be an unauthorized third party while multiple non-borrower, third-party sources would be authorized sources of notification was "absurd at best." *Id.* at 347-48. Ultimately, the court found Rushmore's conduct "reprehensible," and that its formalized procedures were used in this case "to maintain a veil of ignorance of the Chapter 13 proceeding of its borrower." *Id.* at 360. Therefore, under the circumstances, the court concluded that punitive damages were warranted in the amount of $200,000.

Rushmore argues that the bankruptcy court's interpretation of its policies was implausible, and that it did not show reckless disregard for the Moons' rights. Rushmore argues that its policies do not limit notification of a bankruptcy to only the five sources listed considering the permissive language therein: "Notification of a new bankruptcy filing **can** come through the following sources." However, Younger testified that a bankruptcy notice from even a borrower's spouse who lives in the home with the borrower will not trigger a PACER search to verify the information. Younger testified that the only step Rushmore takes to verify that the borrower has filed for bankruptcy when the information comes from an unauthorized source, including a borrower's spouse, is to note the file and continue to call the borrower. And if that is unsuccessful, it services the loan as normal.

Rushmore also argues that its policies suggest an intention to keep it

19

informed about bankruptcies, rather than willfully blind to them, because it is subscribed to ACCER — an automated notification service that provides daily alerts of consumer bankruptcy filings. No one explained why ACCER failed in this case. While this argument has some surface appeal, it does not remedy the fact that Rushmore's institutional policy of disregarding a bankruptcy notice from an "unauthorized" third party is contrary to the law.

Notice of a bankruptcy filing need not be formal for knowledge of the automatic stay and for purposes of a willful stay violation. *See Eden Place, LLC v. Perl (In re Perl)*, 513 B.R. 566, 576 (9th Cir. BAP 2014) (knowledge of the bankruptcy filing equates to knowledge of the automatic stay), *rev'd on other grounds*, 811 F.3d 1120 (9th Cir. 2016). Informal notice suffices. *Id.* (citing *Ozenne v. Bendon (In re Ozenne)*, 337 B.R. 214, 220 (9th Cir. BAP 2006) (citing *Morris v. Peralta (In re Peralta)*, 317 B.R. 381, 389 (9th Cir. BAP 2004))). Clearly, Willie's informal notice in the December 20, 2014 phone call sufficed and constituted actual notice to Rushmore. Once Rushmore had actual notice of the bankruptcy, it had a duty to ascertain the correctness of the information, not disregard it. Rushmore also had the responsibility to ensure that the stay was not violated. *See Sternberg v. Johnston*, 595 F.3d 937, 945 (9th Cir. 2010) (the automatic stay imposes an affirmative duty of compliance on nondebtor parties), *as amended, overruled on other grounds by Am. Servicing Co. v. Schwartz-Tallard ( In re Schwartz-Tallard)*, 803 F.3d 1095, 1100 (9th Cir. 2015) (en banc); *Walters v. Sherwood Mun. Ct. (In re Walters)*, 219 B.R. 520, 526 (Bankr. W.D.

Ark. 1998) ("Being advised of the filing of a bankruptcy case **in any form** places a creditor on notice of the bankruptcy filing. Upon being advised, even informally by telephone, of the bankruptcy case, the creditor is on notice of the bankruptcy. The creditor has an affirmative duty to ascertain the correctness of the information or advice; it may not disregard information of the bankruptcy case.") (emphasis in original).

A sophisticated loan servicer like Rushmore with a policy that intentionally limits the means by which it gains knowledge of a bankruptcy filing supports a finding of reckless or callous disregard for the law and the rights of its borrowers. That no PACER search was done here is not just a one-off case of negligence. No PACER search was done as a matter of an intentional yet flawed institutional policy. As the bankruptcy court noted, "limiting the sources of knowledge of a bankruptcy is as foolish as it is perilous[.]" *In re Moon*, 613 B.R. at 348 n.49. Accordingly, the bankruptcy court's interpretation of Rushmore's policies and procedures was not "implausible," and we see no clear error as to its finding that the case warranted punitive damages.

Rushmore argues that an award of $200,000 was excessive and disproportionate and not necessary to deter it from future stay violations. Rushmore cites a variety of stay violation cases involving lesser awards. The bankruptcy court as the fact finder has considerable discretion in fixing damages. *Prof'l Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council, Inc.*,

727 F.2d 1470, 1473 (9th Cir. 1984).

An award of punitive damages often bears a relationship to the amount of compensatory damages awarded and may take the form of a multiplier of the compensatory damage award. *State Farm*, 538 U.S. at 424-25; *Prof'l Seminar Consultants, Inc.*, 727 F.2d at 1473 (punitive damages award must reasonably relate to compensatory damages). As the Ninth Circuit Court of Appeals recently noted in *Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020), *cert. granted in part sub nom. TransUnion LLC v. Ramirez*, No. 20-297, 2020 WL 7366280 (U.S. Dec. 16, 2020), while "[t]here is no bright-line rule about the maximum ratio due process permits between the harm suffered by the plaintiff (i.e., the compensatory damages) and the punitive damages," the Supreme Court has noted that "punitive 'awards exceeding a single-digit ratio' will rarely satisfy due process, and punitive awards exceeding four times the amount of compensatory damages 'might be close to the line of constitutional impropriety.'" *Id.* at 1036-37 (quoting *State Farm*, 538 U.S. at 425). On the other hand, "[a] ratio higher than 4 to 1 may be upheld where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* (quoting *State Farm*, 538 U.S. at 425) (quoting *Gore*, 517 U.S. at 582)).

In fixing the punitive damages at $200,000, the bankruptcy court decided not to apply a large multiplier because Rushmore did not formally initiate or complete foreclosure proceedings. Hence, it was applying only a

modest single-digit multiplier of 2.0. *In re Moon*, 613 B.R. at 360-61.

We would have had little trouble affirming the bankruptcy court's punitive damages award of $200,000 based on the Moons' compensatory damages of $100,742.10, because we perceive no error in its finding that Rushmore's conduct in this case was "reprehensible." However, because we reverse the award of damages to Willie, we must remand the punitive damages award so the bankruptcy court can reconsider the amount in light of the significantly reduced compensatory award. Nonetheless, bankruptcy courts may consider the amount of attorney's fees and costs in determining the size of a punitive damages award under § 362(k)(1). *See Diviney v. Nationsbank of Tex., N.A. (In re Diviney)*, 225 B.R. 762, 777 (10th Cir. BAP 1998) (holding that attorney's fees and costs may be considered when determining the punitive damages ratio, because fees and costs are a component of "actual damages" under former § 362(h)).

**C.     The bankruptcy court did not abuse its discretion by allowing Rao to testify as an expert witness.**

Rushmore objected to Rao testifying as an expert witness for the Moons but its objection was overruled. Rao is an attorney at the National Consumer Law Center, with extensive experience in bankruptcy and the mortgage servicing industry. His testimony was presented to address Rushmore's actions as compared to mortgage servicing industry standards.

Rao testified that, upon being notified of a borrower's bankruptcy case, mortgage industry standards dictate that a representative notify a supervisor

23

or bankruptcy specialist or attempt to verify the case's existence through PACER. Rao testified that it would not matter whether the representative spoke with the borrower or someone else and that Rushmore's conduct of only noting a possible bankruptcy filing in the file without verifying it on PACER was inconsistent with industry standards.

The bankruptcy court found that Rao's testimony was reliable and relevant to the court's understanding of the evidence presented in the case. *In re Moon*, 613 B.R. at 333. Rushmore argues that the court abused its discretion by overruling its objection and allowing Rao to testify because (1) his opinions were entirely based on his own personal experience in the mortgage servicing business and in consumer bankruptcies, but he did not explain how he came to his conclusions, (2) he failed to show his methodology comported with any accepted professional standards, and (3) his opinion was essentially that Rushmore violated bankruptcy law — something the court itself was charged with determining. Thus, argues Rushmore, Rao could not have been helpful to the trier of fact.

It is the bankruptcy court's duty to act as a "gatekeeper" to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). Rushmore failed to depose Rao, or file any substantive opposition to the Contempt Motion or a trial brief to address his (or anyone else's) direct testimony. At any rate, the only testimony Rao provided that is relevant on

appeal is that, once Rushmore received actual notice of the Moons' bankruptcy from the December 20, 2014 telephone call, industry standards required that the matter be referred to a supervisor or bankruptcy specialist or that the bankruptcy be verified through PACER. The court could have decided these issues without the benefit of Rao's testimony. Evidence of the subject phone call was in Rushmore's own records. Further, bankruptcy law dictates that once Rushmore received actual notice of the Moons' bankruptcy filing from Willie it had a duty to verify that information. The court stated at the evidentiary hearing that it was not considering Rao's testimony that went beyond the scope of expert testimony. However, even if the court did consider such testimony to reach the conclusions that it did on these issues, such error was harmless. *See Lakhany v. Khan (In re Lakhany)*, 538 B.R. 555, 559 (9th Cir. BAP 2015) (we can ignore harmless errors and affirm on any ground supported by the record).

**D. The bankruptcy court did not abuse its discretion by not awarding the Moons discharge injunction violation damages**.

When a discharge order is entered the automatic stay is replaced by the discharge injunction, which operates as a permanent injunction against enforcement of all discharged debts. § 524(a)(2); *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1800 (2019). A party who knowingly violates the discharge injunction under § 524(a)(2) can be held in contempt under § 105(a). *Taggart*, 139 S.Ct. at 1801; *ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.)*, 450 F.3d 996, 1007 (9th Cir.

2006). As one Panel recently noted:

> To find a party in civil contempt, the movant must prove by clear and convincing evidence that the alleged contemnor violated a specific and definite order of the court. *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1190-91 (9th Cir. 2003). The bankruptcy court must also find that the contemnor had sufficient notice of the order's terms and the fact that sanctions would follow a failure to comply. *Hansbrough v. Birdsell (In re Hercules Enters., Inc.)*, 387 F.3d 1024, 1028 (9th Cir. 2004).

*Bateman v. GemCap Lending I, LLC (In re Bateman)*, Nos. HI-18-1302-TaSKu, HI-18-1306-TaSKu, HI-18-1307-TaSKu, 2019 WL 3731532, at *6 (9th Cir. BAP Aug. 7, 2019).

The Moons contend the bankruptcy court failed to identify the correct legal standard in holding that it would not award damages because it could not determine when Rushmore became aware of the discharge. Specifically, the Moons argue, because Rushmore had actual knowledge of the bankruptcy it had actual, or at least constructive, knowledge of the discharge, and the court erred in holding that *Taggart* insulated Rushmore from liability for continuing the same conduct after discharge. Put simply, the Moons argue that we should impute knowledge of the discharge order to Rushmore as of September 28, 2016, and remand the matter to the bankruptcy court to award damages for Rushmore's discharge injunction violation based on that date.

We disagree with the Moons' contention that *Taggart* addressed a creditor's knowledge of the existence of the discharge order; the creditor's

26

knowledge in that case was undisputed. Here, the bankruptcy court found that the discharge order was sent to Rushmore but at an incorrect address. Rushmore also denied receiving it. The only direct evidence of Rushmore's knowledge of the discharge order was Willie's testimony, which the court found to be credible. Willie testified that, after the discharge was entered, he had another telephone conversation with a Rushmore representative and told him about the discharge, but the representative rebuffed him. Willie, however, could not recall when that conversation occurred, and there was no notation in Rushmore's records describing such a telephone conversation. No other witness testified to this call, and no documentary evidence was offered to corroborate Willie's testimony about the call. Willie also testified that he returned certain mail received from Rushmore and indicated on the envelope that he and Adnette had filed for bankruptcy and received a discharge. No envelopes offered into evidence reflected any bankruptcy information.

Given the record, the bankruptcy court said it could find only that Rushmore was informed of the Moons' discharge at "some point" between September 28, 2016 and October 15, 2018. What the Moons failed to prove by clear and convincing evidence was "when." Because they could not prove when Rushmore became aware of the discharge order, there was a "'fair ground of doubt as to the wrongfulness' of Rushmore's post-discharge conduct,'" and the court declined to award damages. *In re Moon*, 613 B.R. at 351-52 & n.59 (quoting *Taggart*, 139 S.Ct. at 1801).

We also disagree with the Moons' contention that the bankruptcy court felt constrained by *Taggart* to award damages for the discharge injunction violation. The court did not appear to question that Rushmore in fact had knowledge of the discharge order and that its post-discharge collection efforts violated it. But, for the purpose of calculating damages, the Moons had to prove a date certain for when that occurred, given that Rushmore was not served with the discharge order and the debtor's burden to establish a violator's knowledge of the order by clear and convincing evidence. Even assuming a PACER search could have revealed the discharge order, the question is "when" did Rushmore conduct that hypothetical search? Without a date, it is unknown what collection efforts occurred after Rushmore knew about the discharge for the purpose of determining damages. As the bankruptcy court observed, if Rushmore learned of it just before it ceased servicing the loan, Rushmore's communications did not constitute a violation of the discharge injunction over a significant period of time.

On this record, we conclude that the bankruptcy court's finding that the Moons had not established when Rushmore became aware of the discharge order was not illogical, implausible, or without support in the record. *In re Retz*, 606 F.3d at 1196.

Alternatively, the Moons argue that the bankruptcy court could have awarded damages for Rushmore's continuing violation of the automatic stay, considering that Rushmore continued engaging in the same misconduct after

28

the discharge. While case law recognizes the concept of a continuing stay violation, such cases are generally limited to a situation where the creditor has failed, or has allegedly failed, to perform an affirmative act to undo an earlier stay violation, such as return property seized postpetition (*Snowden v. Check into Cash of Wash. Inc. (In re Snowden)*, 769 F.3d 651 (9th Cir. 2014)), rescind a postpetition foreclosure sale (*Oya v. Wells Fargo, N.A. (In re Oya)*, No. SC-19-1095-BKuL, 2019 WL 5390007 (9th Cir. BAP Oct. 18, 2019)), or dismiss a postpetition lawsuit (*In re Orian*, 2018 WL 6187784). The bankruptcy court acknowledged this, finding that, because Rushmore had not received any loan payments from the Moons, there was no suggestion of a continuing violation of the automatic stay (or of the discharge injunction). *In re Moon*, 613 B.R. at 339 n.31. Thus, we are not persuaded that this case involves a continuing stay violation entitling the Moons to damages beyond those awarded to Adnette.

Accordingly, we conclude that the bankruptcy court did not abuse its discretion by not awarding the Moons damages for a discharge injunction violation.

### VI. CONCLUSION

For the reasons stated above, we AFFIRM the bankruptcy court's decision that Rushmore willfully violated the automatic stay as to Adnette and to award her compensatory damages of $742.10, but we REVERSE the court's decision awarding Willie $100,000 for his emotional distress. We

29

further AFFIRM the court's decision to allow Rao to testify as an expert witness, and its decision denying the Moons discharge injunction violation damages. Finally, while we AFFIRM the court's decision to award punitive damages, we VACATE and REMAND that decision with respect to the amount awarded given the reduced compensatory damages.